IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** )<br>          )<br>vs.       )<br>          )<br>**LAQUON TERRANCE ROBINSON**  ) | 2:06cr318<br>**Electronic Filing** |

## OPINION

Laquon Terrance Robinson ("defendant") was sentenced to a statutorily mandated minimum sentence of 32 years after pleading guilty to two counts of using or carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). This practice of indicting multiple § 924(c) offenses in a single indictment became known as "stacking." At the time defendant pled guilty and was sentenced, defendant's plea to two § 924(c) counts in a single indictment mandated a sentence of 7 years on the first count and a consecutive 25 years on the second count. Here, that resulted in a 32 year sentence for an individual who was 17 years of age when he committed several armed bank robberies over the course of four weeks as part of "gang" related activity. Presently before the court is defendant's motion for "compassionate release." For the reasons set forth below, the motion must be denied.

Through the passage of "the First Step Act" in December of 2018, the practice of "stacking" § 924(c) counts statutorily has been precluded. After its enactment, the penalties for a second consecutive § 924(c) offense can only be imposed where there is an intervening conviction between the first and second offenses. See 18 U.S.C. § 924(c)(1)(C). Congress withheld retroactive application of this change to the class of offenders whose convictions for stacked § 924(c) offenses had already become final. See First Step Act of 2018, Pub. L. No. 115-391, § 403(a), 132 Stat. 5194, 5221–22.

In Section 601(b) of the First Step Act, Congress also made modifications to 18 U.S.C. § 3582, which previously authorized the Director of the Bureau of Prisons to file a motion with the

sentencing court to modify a term of imprisonment that had already been imposed where "extraordinary and compelling reasons warrant[ed] such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Section 601(b) of the First Step Act now authorizes prisoners to present such motions for "compassionate release" directly to the court.[1] Defendant has requested relief pursuant to such a motion.

In support of his motion, defendant identifies what he characterizes as a number of "extraordinary and compelling reasons," which he further asserts are unique and warrant relief under an "individualized" assessment. These include (1) being a juvenile at the time he committed both of the underlying § 924(c) offenses; (2) his risk of severe illness and/or complications from COVID-19,[2] both from his physical condition of being obese and from the alleged failure of the Bureau of Prisons, and specifically the Federal Correctional Institution at McKean, to protect inmates during the COVID-19 outbreak; (3) the harsh conditions of imprisonment produced by the COVID-19 pandemic; (4) the amount of time he has already served (over 17 years of a 32 year sentence) and (5) his maturation and efforts toward rehabilitation while incarcerated. These circumstances purportedly create an individually unique set of circumstances that distinguish his case from the recently issued decisions of the court of appeals which upheld the denial of relief to teenage offenders who were sentenced "under the now defunct § 924(c) 'Stacking' practice." Request to Supplement (Doc. No. 190) at 3.

---

[1] The compassionate release provision states that a district court "may reduce the term of imprisonment" and "impose a term of probation or supervised release" if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).

[2] The novel coronavirus, or SARS-CoV-2, is a virus that spreads through exposure to respiratory fluids such as droplets or aerosol particles. See https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html. The disease that can result from exposure is known as COVID-19, which was first identified by the World Health Organization on February 11, 2020. https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html.

The government opposes the motion from several angles. First, it maintains that defendant has failed to identify extraordinary or compelling reasons warranting relief. Second, it asserts defendant has declined to avail himself of the COVID-19 vaccines and has endured an actual COVID-19 infection, rendering his claimed susceptibility to severe disease or death from the virus specious and undermining the contention that he remains subject to a severe and unavoidable risk of heightened illness or death from the virus. Finally, the government contends that the court's decision in United States v. Andrews, 12 F.4th 255 (3d Cir. 2021), forecloses relief based on the § 924(c) component of his motion because defendant's sentence was lawful at the time it was imposed and as a result it cannot be construed as an extraordinary or compelling reason for compassionate release.

We agree with the government that the court's holding and analysis in Andrews forecloses any consideration of the underlying record as it relates to the stacking of the § 924(c) charges and the sentence defendant received as part of identifying and finding an extraordinary or compelling reason to modify defendant's sentence. Both were lawful at the time: the United States was permitted to pursue multiple charges under § 924(c) in the same indictment and obtain the enhanced penalties for a subsequent offense without an intervening conviction, provided the offenses occurred on separate dates. That is precisely what occurred here. Defendant was charged with multiple § 924(c) offenses occurring on four separate dates: March 29, 2005; March 30, 2005; April 8, 2005; and April 19, 2005, see indictment at 2:06cr318, and he received what at the time was a lawful mandatory minimum sentence of 32 years after pleading guilty to two of those offense. See Mandate of USCA (Doc. No. 87) (affirming defendant's conviction and sentence based upon the appellate waiver in defendant's plea agreement).

The court in Andrews expressly held that the length of a lawfully imposed sentence cannot create an extraordinary or compelling circumstance in support of a compassionate release motion. It opined:

> "[T]here is nothing 'extraordinary' about leaving untouched the exact penalties that Congress prescribed and that a district court imposed for particular violations of a statute." United States v. Thacker, 4 F.4th 569, 574 (7th Cir. 2021). "Indeed, the imposition of a sentence that was not only permissible but statutorily required at the time is neither an extraordinary nor a compelling reason to now reduce that same sentence." United States v. Maumau, 993 F.3d 821, 838 (10th Cir. 2021) (Tymkovich, C.J., concurring). Moreover, considering the length of a statutorily mandated sentence as a reason for modifying a sentence would infringe on Congress's authority to set penalties. See Gore v. United States, 357 U.S. 386, 393, 78 S. Ct. 1280, 2 L.Ed.2d 1405 (1958) ("Whatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility, these are peculiarly questions of legislative policy." (citation omitted)).

Andrews, 12 F.4th at 261.

The Andrews court further opined:

> The nonretroactive changes to the § 924(c) mandatory minimums also cannot be a basis for compassionate release. In passing the First Step Act, Congress specifically decided that the changes to the § 924(c) mandatory minimums would not apply to people who had already been sentenced. See First Step Act § 403(b). That is conventional: "[I]n federal sentencing the ordinary practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." Dorsey v. United States, 567 U.S. 260, 280, 132 S. Ct. 2321, 183 L.Ed.2d 250 (2012). "What the Supreme Court views as the 'ordinary practice' cannot also be an 'extraordinary and compelling reason' to deviate from that practice." United States v. Wills, 997 F.3d 685, 688 (6th Cir. 2021).

Andrews, 12 F.4th at 261.

The Andrews court thus reasoned that permitting the sentencing courts to consider either the length of sentence or the effect of the nonretroactive changes to § 924(c) as forming an extraordinary and compelling reasoning for granting compassionate release in a particular case would simultaneously deem an "ordinary practice" to be an extraordinary one, treat the statutory scheme in the First Step Act in a disharmonious fashion and "sow conflict within the statute." Id. In so holding, the court joined the Sixth, Seventh and Eight Circuits. Id. ("We join the Sixth and Seventh Circuits in reaching this conclusion.") (citing United States v. Jarvis, 999 F.3d 442,

444–46 (6th Cir. 2021); United States v. Thacker, 4 F.4th 569, 576 (7th Cir. 2021) and United States v. Loggins, 966 F.3d 891, 892–93 (8th Cir. 2020) (district court did not misstate the law in finding "that a non-retroactive change in law did not support a finding of extraordinary or compelling reasons for release")).

Another view has emerged. In United States v. Ruvalcaba, the United States Court of Appeals for the First Circuit recently examined the issues raised by a motion for compassionate release predicated in part on the nonretroactive aspects of the First Step Act. 26 F.4th 14 (1st Cir. 2022). There, the defendant was serving a life sentence after being convicted in 2009 of a drug trafficking conspiracy. 26 F.4th at 15-16. He sought relief through a compassionate release motion based in part on the nonretroactive changes the first Step Act made to the mandatory minimum sentences in 21 U.S.C. § 841(b)(1)(A). The district court ruled among other things that the nonretroactive changes could not be used as a component of an extraordinary and compelling reason for compassionate release. Id. at 18. Among other reasons, the district court emphasized that the changes were prospective and any ensuing disparity could not be deemed extraordinary; to rule otherwise, the court reasoned, would improperly usurp the role of Congress in making the decision to withhold retroactive application of the changes and run afoul of the finality accorded to sentences. Id.

Writing for the panel, Judge Selya held that the district court had improperly construed the scope of its discretionary authority in considering motions for compassionate release when it concluded that the non-retroactivity provision accompanying the First Step Act's statutory changes in sentencing ranges categorically barred consideration of those changes in any individual case as part of a compassionate release analysis. Id. at 24-26. The Ruvalcaba court held:

> the district court's categorical exclusion of non-retroactive changes in sentencing law from the "extraordinary and compelling" calculus is neither consistent with the relevant

5

statutory text nor compelled by the arguments embraced by the district court. While we agree that the mere fact of a "pre-First Step Act mandatory life sentence imposed under [section] 841(b)(1)(A) cannot, standing alone, serve as the basis for a sentence reduction under [section] 3582(c)(1)(A)(i)," [], that is only part of the picture. The other part of the picture is decisive here: it is within the district court's discretion, in the absence of a contrary directive in an applicable policy statement, to determine on a case-by-case basis whether such changes in law predicated on a defendant's particular circumstances comprise an extraordinary and compelling reason and, thus, satisfy the standard for compassionate release under section 3582(c)(1)(A)(i).

26 F.4th at 28 (quoting United States v. McGee, 992 F.3d 1035,1048 (10th Cir. 2021) and citing United States v. McCoy, 981 F.3d 271, 288 (4th Cir. 2020)).

In reaching its holding, the Ruvalcaba court noted that the courts of appeals have reached inconsistent determinations on the propriety of considering the non-retroactive changes as part of assessing whether extraordinary and compelling reasons for compassionate release have been presented. The Courts of Appeals for the Third, Seventh and Eight Circuits have held "that such sentencing disparities may be considered by a district court only in weighing the section 3553(a) factors [], - an issue that need not be reached unless and until the court first finds that an extraordinary and compelling reason exists." 26 F.4th at 24 (citing Andrews, 12 F.4th at 262 and United States v. Thacker, 4 F.4th 569, 574 (7th Cir. 2021)); accord United States v. Crandall, 25 F.th 582, 685-86 (8th Cir. 2022). In contrast, the Tenth Circuit in McGee and the Fourth Circuit in McCoy have concluded "that there is enough play in the joints for a district court to consider the FSA's non-retroactive changes in sentencing law (in combination with other factors) and find an extraordinary and compelling reason in a particular case, without doing violence to Congress's views on the prospective effect of the FSA's amendments." Ruvalcaba, 26 F.4th at 24.

Judge Selya advanced two principles in support of the court's holding. First, in promulgating limitations on the boundaries of what can constitute an extraordinary and compelling reason warranting compassionate release, Congress directed "that rehabilitation ... alone shall not be considered an extraordinary and compelling reason." Ruvalcaba, 26 F.4th at 25

(quoting 28 U.S.C. § 994(t)). In passing the FSA, Congress did not add to this limitation by expressly prohibiting the district courts from considering non-retroactive changes in sentencing law on a case-by-case basis. Id. Nor did the court "see any textual basis in the FSA for a categorical prohibition anent non-retroactive changes in sentencing law." Id. To the contrary, the entirety of the legislative backdrop brought into play counseled against inferring "that Congress intended such a categorical and unwritten exclusion." Id.

Second, recognizing "that a district court may consider the FSA's prospective amendments to sentencing law as part of the extraordinary and compelling calculus fits seamlessly with the history and purpose of the compassionate release statute." Id. Congress recognized the importance of the compassionate release provision as providing a "safety valve" for considering changed circumstances on an individualized basis in conjunction with the development of a system that eliminated parole and the ongoing review of a parole board. Id. "To serve as a safety valve, section 3582(c)(1)(A) must encompass an individualized review of a defendant's circumstances and permit a sentence reduction — in the district court's sound discretion - based on any combination of factors (including unanticipated post-sentencing developments in the law)." (citing Setser v. United States, 566 U.S. 231, 242-43 (2012) ("[W]hen the district court's failure to anticipate developments that take place after the first sentencing produces unfairness to the defendant," section 3582(c)(1)(A) "provides a mechanism for relief.") (quotations and alteration omitted)).

Third, the foundational principles supporting the contrary view cannot "bear the weight" the district court and other courts of appeals have attached to them. The notion that an individualized assessment as part of a compassionate release analysis is somehow a substitute for the Congressional prohibition against retroactivity and the rule of finality of judgments misperceives the nature of the inquiry in question. It must be taken as a given that Congress did

not intend the FSA's non-retroactive amendments to create simultaneously an extraordinary and compelling reason for early release.  But "there is a salient 'difference between automatic vacatur and resentencing of an entire class of sentences' on the one hand, 'and allowing for the provision of individual relief in the most grievous cases' on the other hand."  Id.  ((quoting McGee, 992 F.3d at 1047 and McCoy, 981 F.3d at 286-87)).  And in this regard "Congress's judgment to prevent the former is not sullied by a district court's determination, on a case-by-case basis, that a particular defendant has presented an extraordinary and compelling reason due to his idiosyncratic circumstances (including that his mandatory minimum sentence under section 841(b)(1)(A) would have been significantly shorter under the FSA)."  To the contrary, where "the individualized circumstances, taken in the aggregate, satisfy the 'extraordinary and compelling' standard, granting relief would be consistent with Congress's judgment that a modification of a sentence legally imposed may be warranted when extraordinary and compelling reasons for taking that step exist."  Id.  "And conversely, this part of the compassionate-release statute is no help to a defendant who presents only ordinary reasons."  Id. (citing United States v. Saccoccia, 10 F.4th 1, 5 (1st Cir. 2021) ("Words like 'extraordinary' and 'compelling,' when used by Congress in framing a statute, must be given their plain meaning.")).

   Similarly, the proposition that "Congress's judgment to limit the retroactivity of certain changes in the FSA affecting sentencing exposure can never be considered extraordinary and compelling because 'there is nothing 'extraordinary' about leaving untouched the exact penalties that Congress prescribed and that a district court imposed for particular violations of a statute'" begs the question and forecloses the very safety valve assessment Congress created through the concept of compassionate release.  Id. (quoting Thacker, 4 F.4th at 574).  Although the proposition may well turn out to be true in the vast majority of cases, such a determination can only properly be made in the compassionate release context after an individualized consideration

8

encompassing the interactions among any countless number of factors, including changes that have been made to the sentencing laws in the years (and often decades) after the imposition of sentence.

In light of the above, the Ruvalcaba court concluded that "[a]s a general matter, a district court, reviewing a prisoner-initiated motion for compassionate release in the absence of an applicable policy statement, may consider any complex of circumstances raised by a defendant as forming an extraordinary and compelling reason warranting relief." Id. at 28. And in doing so, a district court adjudicating such a motion may consider the FSA's non-retroactive amendments to the scope of the mandatory minimum penalties under [the applicable statutory section] on a case-by-case basis grounded in a defendant's individualized circumstances to find an extraordinary and compelling reason warranting compassionate release." Id.

Here, defendant advances a reading of Andrews that places it in the same genre as Ruvalcaba. But as noted by Ruvalcaba, a straightforward reading of Andrews precludes such an approach. Instead, under Andrews, we may only consider the changes in sentencing law brought about by the anti-stacking provision in the FSA after finding that other, independent circumstances have coalesced into an extraordinary and compelling reason warranting compassionate release. Andrews, 12 F.4th at 262 ("But in holding that the statutorily required sentence or Congress's nonretroactive sentencing reductions are not extraordinary and compelling reasons for purposes of § 3582(c)(1)(A), we are not saying that they are always irrelevant to the sentence-reduction inquiry. If a prisoner successfully shows extraordinary and compelling circumstances, the current sentencing landscape may be a legitimate consideration for courts at the next step of the analysis when they weigh the § 3553(a) factors.") (citing United States v. Jarvis, 999 F.3d 442, 445 (6th Cir. 2021) and Thacker, 4 F.4th at 575–76). We therefore turn to that undertaking.

Without consideration of the changes the FSA had on the sentencing laws governing defendant's stacked 924(c) offenses, defendant has failed to demonstrate the existence of extraordinary and compelling circumstances warranting compassionate release. To be sure, defendant's current physical state of being obese does place him at heightened risk for more severe complications from COVID-19. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (identifying being overweight and/or obese as a condition which increases the risk for more severe complications and outcomes from COVID-19 disease). Further, defendant's risk of infection and the potential for severe complications is exacerbated by the general living conditions created within the institutional setting. Thus, Defendant does have a condition that could rise to the level of and provide a basis for the existence of an extraordinary and compelling circumstance. However, the Defendant's condition of being obese is not the only thing the Court must consider and the remaining information available meaningfully undercuts his claim that he is being exposed to an ongoing health risk that is exacerbated and remains acutely severe.

First, the enhanced risks defendant faces within the institution must be balanced against the Bureau of Prisons' ("BOP") persistent and ongoing efforts to control outbreaks of the disease and implement measures that fulfill its statutory obligation to provide inmates with a safe environment and needed medical care. See https://www.bop.gov/coronavirus; accord United States v. Raia, 954 F.3d 594, 596 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.") (citing the BOP's COVID-19 Action Plan); United States v. Stallings, 2020 WL 3619071, *4 (M.D. Pa. July 2,

2020) (extensive efforts of BOP in preventing and controlling outbreaks of COVID-19 properly are considered in assessing its ability to manage an inmate's institutional and medical needs). That plan has involved modified operations since the initial outbreak of COVID-19, *see* BOP Modified Operations (https://www.bop.gov/coronavirus/covid19_status.jsp), along with refined measures that have been informed by collaboration with the Coronavirus (COVID-19) Task Force, the Center for Disease Control and the COVID-19 Vaccine/Therapeutics Operation. https://www.bop.gov/coronavirus. As of October 20, 2022, the BOP reports having 143,394 federal inmates in BOP-managed institutions and 14,072 in community-based facilities. Its staff complement is approximately 36,000. It has about 160 federal inmates and 367 BOP staff who have "confirmed" positive test results for COVID-19 nationwide. Currently, 48,556 inmates and 14,262 staff have recovered. There have been 309 federal inmate deaths and 7 BOP staff-member deaths attributed to COVID-19 disease. Of the inmate deaths, 11 occurred while on home confinement. Id. These statistics appear to be the product of a reasonable response to and management of the risks posed by the relentless SARS-CoV-2 and its ongoing mutations.

  More specifically, a total of 377 inmates and 41 staff members at FCI McKean have tested positive for COVID-19 since the start of the pandemic. Id. Even with the significant number of positive cases among both inmates and staff members, no deaths have been reported. Id. As of this date, of the approximately 1,113 inmates housed at FCI McKean, the facility is only reporting 16 positive inmate cases. Id. These circumstances further undercut the current and recurrent degree of risk which defendant faces. Cf. United States v. Henderson, 858 F. App'x. 466, 468-69, 2021 WL 2156910, *2 (3d Cir. May 27, 2021) ("As the [District] Court explained, the outbreak of COVID-19 at FCC-Allenwood (where Henderson was housed) had been contained and, at the time of the decision, there was only 1 active case at the prison

11

complex. Thus, the risk of Henderson contracting COVID-19 was low and did not constitute an "extraordinary and compelling reason" for a sentence reduction.").

Moreover, the BOP's modified operations plan has included a roll-out of the available vaccines to staff and inmates. To date, the BOP has been able to administer over 332,149 doses of the COVID-19 vaccine to both staff and inmates throughout the nation. https://www.bop.gov/coronavirus.[3] It is important to note that 997 out of the 1,113 inmates at FCI McKean are fully vaccinated. Id. After the administration of over 627 million doses of the available COVID-19 vaccines under the current emergency authorizations, the CDC continues to report that they are safe and effective. See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/safety-of-vaccines.html. General side effects are minimal and minor and serious adverse reactions have been rare. Id. Indeed, anaphylaxis can be treated and successfully controlled shortly after injection through established medical protocol and the rare response of thrombosis with Thrombocytopenia Syndrome after receiving the J & J vaccine occurs in women at the rate of approximately four cases per one million vaccinated individuals. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html. The ongoing availability of the vaccines and their concomitant safety record further diminish the risk of severe sickness or death to all of the inmates under the BOP's care, including defendant. Cf. https://www.bop.gov/coronavirus (noting the increase in control of the virus from the BOP's ongoing roll-out efforts); https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html (noting the effectiveness of the approved vaccines against severe illness, complications and death among all age groups).

---

[3] This number does not include staff who received their vaccines through a community provider. Id.

12

Against this backdrop, a decision to reject vaccination cannot displace the diminishing effects that the availability of the vaccines have had on the risks facing inmates such as defendant. Absent some compelling justification, the insidious decision to decline the vaccine when offered by the BOP negates an inmate's basic contention that release is warranted due to the existence of extraordinary and compelling medical reasons. See United States v. Jackson, 2021 WL 1145903, *2 (E.D. Pa., March 25, 2021) ("Where Jackson bears the burden of demonstrating her entitlement to relief, the Court finds that her unexplained refusal to accept a COVID-19 vaccination when offered negates her otherwise compelling medical reasons for release.") (collecting cases in support); United States v. Austin, 2021 WL 1137987, *2 (E.D. Mich. March 25, 2021) ("A prisoner cannot on the one hand point to the risk of severe illness, while on the other hand refuse to participate in basic precautionary measures such as vaccination."). Furthermore, according to the defendant's medical records submitted to this court, defendant refused to be vaccinated from COVID-19 and contracted COVID-19 in January of 2021. Fortunately, he did not suffer severe illness.

In short, while defendant's medical condition does create a risk for contracting COVID-19 for a second time, and to a lesser degree, developing complications resulting in severe illness and/or death, the potential for these risks to materialize must be viewed through the lens of the BOP's ongoing response to the SARS-CoV-2 and its efforts to provide for defendant's medical needs. Viewed in this context, defendant has not met his burden of demonstrating extraordinary and compelling circumstances warranting his immediate release.

To be sure, there is nothing "ordinary" about imposing a 32 year statutorily mandated minimum sentence on an individual for committing two armed robbery offenses within weeks of each other and while that individual was a minor. In over twenty years of experience, this is the only occasion where this member of the court has been required to impose such a sentence. But

this sentence is what the law required fourteen years ago when defendant entered his plea of guilty and thereafter was sentenced. Thus, Andrews requires that we treat the circumstances underlying defendant's offense conduct and the resulting sentence as an ordinary and lawful conviction that is beyond what may be considered in determining whether extraordinary and compelling reasons have been presented in support of a motion for compassionate release. Without consideration of the circumstances underlying and constituting defendant's "stacked" sentence, defendant is unable to establish that an initial presentation of extraordinary and compelling reason for compassionate release is present. Consequently, there is no basis to consider the sentencing factors set forth in 28 U.S.C. § 3553(a).

For the reasons set forth above, defendant's motion for compassionate release must be denied. An appropriate order will follow.

Date: December 9, 2022

                                                  s/David Stewart Cercone
                                                  David Stewart Cercone
                                                  Senior United States District Judge

cc:      Michael Ivory, AUSA
          William C. Kaczynski, Esquire

          (*Via CM/ECF Electronic Mail*)

          Laquon Terrance Robinson
          Reg. #09054-068
          FCI McKean
          P.O. Box 8000
          Bradford, PA 16701

          (*Via First Class Mail*)