**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | 2:06cr318 |
| | ) | **Electronic Filing** |
| | ) | |
| **LAQUON TERRANCE ROBINSON** | ) | |

**OPINION**

Laquon Terrance Robinson ("Robinson" or "defendant") was sentenced to a statutorily mandated minimum sentence of thirty-two (32) years after pleading guilty to two counts of using or carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c), and four counts of armed bank robbery in violation of 18 U.S.C. § 2113(d). Presently before the court is Robinson's second motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). ECF No. 213. For the reasons set forth below, defendant's motion will be granted.

During a three-week period in March and April of 2005, Robinson committed four armed bank robberies. He brandished a firearm during two of these. This spree commenced when he was sixteen years old and ended just two weeks after his seventeenth birthday. Local authorities arrested him approximately two weeks after the last robbery and he subsequently was taken into custody. In November of 2005, the charges filed against him in state court were adopted for federal prosecution in this court. Since Robinson committed the underlying offenses as a juvenile, the government moved to transfer his case from a juvenile delinquency proceeding to an adult criminal prosecution under the mandatory and discretionary transfer provisions of the Federal Juvenile Delinquency Act. See 18 U.S.C. § 5032.

This court granted the government's requests and Robinson later pled guilty to four counts of armed bank robbery in violation of 18 U.S.C. § 2113(d), and two counts of using or carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). At sentencing,

Robinson faced two mandatory minimum consecutive terms of imprisonment for his § 924(c) convictions: 7 years for the first and 25 years for the second.[1]  This court sentenced him to the 32-year mandatory sentence for those counts, and it imposed no further penalty for the remaining counts.  Robinson was twenty years old at the time.

Robinson now moves for a reduced sentence of time served under 18 U.S.C. § 3582(c)(1)(A)(i).  Ordinarily, a district court may not modify a defendant's sentence after it has been imposed except in limited circumstances.  See 18 U.S.C. § 3582(b); see also Dillon v. United States, 560 U.S. 817, 824 (2010).  One such circumstance is set forth in 18 U.S.C. § 3582(c)(1)(A)(i), often referred to as the "compassionate release statute."  Under this statute, a sentencing court may reduce a term of imprisonment if it finds that "extraordinary and compelling reasons warrant such a reduction," and that the reduction is consistent with the United States Sentencing Commission's policy statements and the factors set forth in 18 U.S.C. § 3553(a).  18 U.S.C. § 3582(c)(1)(A)(i).  So, Robinson's motion raises three questions: "(1) whether there are 'extraordinary and compelling reasons' for modifying an imposed term of imprisonment; (2) whether a new sentence would be consistent with the factors set forth in 18 U.S.C. § 3553(a); and, (3) whether a new sentence would be consistent with any applicable policy statement."  United States v. Carter, 711 F. Supp. 3d 428, 435 (E.D. Pa. 2024).

In support of his motion, Robinson identifies several circumstances that he argues constitute "extraordinary and compelling reasons" to reduce his sentence: (1) his youth at the time of the offense of conviction, especially "when viewed in light of intervening developments in neuroscience, psychology, and sociology" regarding juvenile offenders; (2) the transfer of his case to federal district court which subjected him "to a harsh mandatory sentence" and made it so that "his youth could not matter;" (3) the "mandatory" transfer of his case was predicated on

---

[1] Robinson pled guilty to the two § 924(c) counts that charged him with brandishing a firearm.

conduct that Robinson committed when he was just twelve years old and on "a flawed legal judgment" regarding his prior delinquency adjudication; (4) the impact of adult incarceration on juvenile and youthful offenders; and (5) his efforts at rehabilitation.[2]  ECF No. 213 at 23.

The government opposes the motion and counters on several grounds.  First, the government argues that when this court denied Robinson's first motion for compassionate release, it determined that his age at the time of his offenses may not be considered under the "extraordinary and compelling" prong of the compassionate release analysis.  ECF No. 222 at 11.  It further asserts that this determination constitutes the law of the case, and therefore, Robinson is precluded from re-raising the same argument here.  Id.  Moreover, the government argues that when this court sentenced Robinson, it was aware of his age at the time of his offenses and such facts cannot be "repackaged" as reasons for compassionate release.  Id. at 13.  Finally, the government contends that the transfer process was not flawed and that any purported legal errors committed therein are inappropriate bases for compassionate release.  Id. at 21.

For the reasons set forth below, Robinson has satisfied all the requirements for his motion to be granted.  First, he has met the statutory exhaustion requirement of 18 U.S.C. § 3582(c)(1)(A).[3]  Next, Robinson has presented a combination of circumstances that, when

---

[2] Previously, a motion for compassionate release could only be brought by the Bureau of Prisons.  But this changed in 2018 with the passage of the First Step Act, which, *inter alia*, authorized criminal defendants to request such relief on their own behalf after they have exhausted all administrative remedies through the Bureau of Prisons ("BOP").  18 U.S.C. § 3582(c)(1)(A).

[3] Robinson submitted his first request for compassionate release to the Warden of FCI-Manchester on August 4, 2023, which was denied on September 5, 2023.  See ECF Nos. 213 at 18; 213-1.  He filed the present motion on October 20, 2023.  Robinson submitted a second request to the Warden on November 1, 2023.  See ECF No. 225-1.  Thereafter, he filed a supplement to his motion on January 16, 2024.  Thus, in both instances, over 30 days had lapsed since the Warden received Robinson's requests.  See United States v. Harris, 973 F.3d 170, 171 (3d Cir. 2020) ("The Government argued . . . that because the Warden denied Harris's request within thirty days, he was required to completely exhaust the administrative remedy process.  However, the statute states that the defendant may file the motion thirty days after the warden receives his request.").

3

considered together, amount to extraordinary and compelling reasons to reduce his sentence: (1) his juvenile status at the time of his offenses, (2) the transfer of his case to federal district court for prosecution as an adult, and (3) the rehabilitative progress he has made in light of being incarcerated with adults as a juvenile.  Moreover, the factors set forth in § 3553(a) weigh in favor of his requested relief.  Finally, Robinson has shown that a sentence reduction is consistent with the United States Sentencing Commission's applicable policy statements.

At the outset, Robinson has met the threshold burden of establishing his eligibility for compassionate release.  When resolving a motion for compassionate release, the United States Court of Appeals for the Third Circuit has instructed that "[a] sentencing court must first conclude, as a matter of law, that a prisoner is *eligible* for a sentence reduction before it decides whether he *qualifies* for a reduction."  United States v. Rutherford, 120 F.4th 360, 364 (3d Cir. 2024).  For a defendant to clear this "threshold eligibility hurdle," he must establish an extraordinary and compelling reason for release under § 3582(c)(1)(A)(i).  United States v. Stewart, 86 F.4th 532, 535 (3d Cir. 2023).

Except for providing that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason," Congress did not define this phrase.  28 U.S.C. § 994(t).  Rather, Congress instructed the United States Sentencing Commission to "describe what should be considered extraordinary and compelling reasons . . . including the criteria to be applied and a list of specific examples."  Id.  In April of 2023, the Sentencing Commission issued an amended policy statement defining "extraordinary and compelling reasons" for prisoner-filed motions for compassionate release.  Rutherford, 120 F.4th at 366.

The revised policy statement identified potential extraordinary and compelling reasons based on the defendant's: (1) medical circumstances; (2) age; (3) family circumstances; (4) history of abuse; (5) other reasons similar in gravity to (1)-(4); and (6) unusually long sentence.

U.S.S.G. § 1B1.13.  These guideline revisions took effect on November 1, 2023, approximately two weeks after Robinson filed his initial motion.

Robinson subsequently supplemented his motion to address the newly-promulgated policy statement.  See ECF No. 225.  In this supplement, he argues that he is eligible for compassionate release pursuant to the "other reasons" catchall provision set forth in § 1B1.13(b)(5) of the amended policy statement (hereinafter "(b)(5)"), as well as the "unusually long sentence" provision set forth in § 1B1.13(b)(6) (hereinafter "(b)(6)").  These subsections state:

> **(5)  Other Reasons.**--The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).
>
> **(6) Unusually Long Sentence.**--If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

U.S.S.G. §§ 1B1.13(b)(5)–(6).

As referenced above, paragraphs (1) through (4) of the policy statement describe various circumstances that constitute "extraordinary and compelling reasons," such as when a defendant is: (1) suffering from a terminal illness or serious and chronic medical condition; (2) experiencing a serious deterioration in physical or mental health due to aging; (3) the only available caregiver for their incapacitated family member or minor child; or (4) the victim of sexual abuse or serious bodily injury committed by the BOP or its agents.  See U.S.S.G. §§ 1B1.13(b)(1)–(4).  Thus, to be successful under (b)(5), Robinson must present circumstances that are "similar in gravity" to these situations.

With respect to (b)(5), Robinson's supplement emphasizes his "extreme youth" and "vulnerability" at the time of his offense and prior juvenile delinquency adjudication, and he argues that these factors should be "evaluated in light of current understandings regarding youth and punishment."  ECF No. 225 at 22.  He also points out that "he spent 23-hours a day in isolation" between the ages of seventeen and nineteen and "essentially grew up incarcerated in facilities not equipped to accommodate youthful offenders."  Id. at 22–23.  Since "the attributes of youth diminish the penological justifications for imposing harsh sentences on juvenile offenders," Robinson argues that these factors, *inter alia*, present circumstances that are "similar in gravity" to the extraordinary and compelling reasons listed in paragraphs (1) through (4).  Id. at 8.  And while Robinson also seeks relief under (b)(6), he contends that the court need not decide whether to grant relief on this basis because he is eligible for a sentence reduction under (b)(5) alone.  Id. at 4.

The government counters that the circumstances Robinson proffers are not "similar in gravity" to those listed in paragraphs (1) through (4) of § 1B1.13(b) because "[a]ll these provisions pertain to situations arising during incarceration and are generally not foreseen at the outset."  ECF No. 243 at 3.  It further urges the court to disregard Robinson's invitation to "view his motion in light of post-sentence developments in psychology, sociology and the like," because these advancements "focus on the impulsivity or impetuosity purportedly exhibited by juvenile offenders" and "Robinson's crimes were committed with caution and calculation."  Id.

The government's arguments are misplaced.  With respect to the temporal scope of (b)(5), the policy statement clarifies that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  U.S.S.G. § 1B1.13(e).  In other words, "the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court

does not preclude consideration for a reduction under this policy statement." Id.  Moreover, the Sentencing Commission "considered but specifically rejected a requirement that 'other reasons' [under (b)(5) must] be similar in *nature and consequence* to the specified reasons" set forth in the preceding four sections.  U.S. Sentencing Commission, Amendments to Sentencing Guidelines, Effective Date November 1, 2023, at 4–5 (Apr. 27, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf (emphasis added).

It follows that Robinson's proffered reasons do not automatically fail (b)(5)'s "similar in gravity" limitation simply because they neither arose during his incarceration nor were unforeseen "at the outset."  Instead, the circumstances enumerated in paragraphs (1) through (4) "are scenarios falling outside the experience of nearly all federal inmates," or "[i]n other words . . . they are truly 'grave': 'involving or resulting in serious consequence; likely to produce real harm or damage.'"  Carter, 711 F. Supp. 3d at 441 (quoting Webster's Third New International Dictionary 992 (1993)).  As the discussion herein will demonstrate, Robinson has presented such circumstances.

Before analyzing Robinson's extraordinary and compelling reasons, the government's argument regarding this court's prior ruling must be addressed.  In 2019, Robinson filed his first motion for compassionate release.  See ECF No. 132.  Significantly, one of the extraordinary and compelling reasons that Robinson presented in support thereof was his juvenile status at the time he committed the underlying offenses.  See ECF No. 195 at 2.  Before this court ruled upon Robinson's motion, the Third Circuit issued United States v. Andrews, which held that neither the length of a lawfully imposed sentence, nor the nonretroactive changes to the § 924(c) mandatory minimums, could serve as a basis for compassionate release. 12 F.4th 255 (3d Cir. 2021).

Ultimately, this court held that <u>Andrews</u> required it to "treat the circumstances underlying defendant's offense conduct and the resulting sentence as an ordinary and lawful conviction that is beyond what may be considered in determining whether extraordinary and compelling reasons have been presented in support of a motion for compassionate release." ECF No. 195 at 14. In so holding, the court interpreted <u>Andrews</u> as prohibiting consideration of Robinson's juvenile status at the time he committed the underlying offenses. As a result, the court confined its analysis to Robinson's remaining arguments—which concerned his vulnerability to COVID-19—and it concluded that he had not demonstrated that he was eligible for relief. Therefore, his motion was denied. ECF No. 196.

The government now urges the court to adhere to its prior decision and decline to revisit the issue of whether Robinson's age at the time of his offenses can be considered under the "extraordinary and compelling" prong of the compassionate release analysis. But the government's own words provide enough support for refusing to do so—after Robinson appealed the denial of his first motion, the government acknowledged in its appellate brief that this court had misread <u>Andrews</u>:

> <u>Andrews</u> did not direct, as the District Court seemed to think, that any defendant whose sentence (stacked or otherwise) was legal at the time of imposition must have a motion for compassionate release ruled upon "without consideration of the circumstances underlying the legal sentence." Indeed, no part of <u>Andrews</u> seems suggest [sic] such an expansive reading.

<u>United States v. Robinson</u>, No. 22-3414, Docket No. 11 at 24 (3d Cir., Mar. 2, 2023) (citation omitted). Thereafter, Robinson sought remand to permit this court to, *inter alia*, address in the first instance the circumstances it did not consider due to its "misapplication of <u>Andrews</u>." <u>Id.</u> at Docket No. 28 ¶ 13. The Third Circuit granted Robinson's motion over the government's opposition thereto. <u>See</u> ECF No. 210.

In somewhat of an about-face, the government now argues that Robinson's motion "provides . . . no reason why the Court needs to readdress the issue of his age at the time of the offenses."  ECF No. 222 at 12.  While Robinson contends that both parties agreed on appeal that this court had misread Andrews, the government characterizes this assertion as "not accurate" because it "argued that this court reached the right decision in denying [his] motion."  Id. at 10 n.1.

Notwithstanding the government's curious post-remand enlightenment, Robinson is, at the very least, entitled to have this court determine whether his age at the time of his offenses is an extraordinary and compelling reason.  Indeed, "no part of Andrews seems [to] suggest" that Robinson "must have [his] motion for compassionate release ruled upon without consideration of the circumstances underlying [his] legal sentence."  Robinson, No. 22-3414, Docket No. 11 at 24 (citation and internal quotation marks omitted).  Even the district court in Andrews considered the defendant's young age at the time he committed the offenses as part of its "extraordinary and compelling" analysis.  See United States v. Andrews, 480 F. Supp. 3d 669, 687 (E.D. Pa. 2020).  And because this court previously read Andrews as prohibiting consideration of this factor altogether—a proposition that the government essentially confessed as err on appeal—it is not duty bound to repeat that mistake.  In other words, the court will not simply adhere to its prior interpretation.  Nor is Robinson precluded from re-raising his prior arguments here.

Turning to the extraordinary and compelling reasons Robinson has presented, the court finds that his age at the time he committed the underlying offenses weighs heavily in favor of granting compassionate release.  Robinson was only sixteen years old when he committed the two § 924(c) offenses for which he was sentenced, and he had just turned seventeen years old when he committed the other two bank robbery offenses of conviction.  That is to say, when

Robinson committed the underlying offenses, he was a *juvenile*. And Robinson's juvenile status makes his "young age" at the time of his offenses particularly exceptional.

To be sure, many defendants have unsuccessfully presented their young age as a basis for compassionate release. See Andrews, 480 F. Supp. 3d at 687 (nineteen); Carter, 711 F. Supp. 3d at 440 (E.D. Pa. 2024) (late twenties); United States v. Gordon, 585 F. Supp. 3d 716, 722 (E.D. Pa. 2022) (twenty-one through twenty-four); United States v. Jones, No. CR 07-143 (SRC), 2023 WL 2986928, at *5 (D.N.J. Apr. 18, 2023) (twenty). But "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood." Roper v. Simmons, 543 U.S. 551, 574 (2005). More importantly, it is the age at which the Supreme Court has drawn the line for individuals who are "constitutionally different from adults for purposes of sentencing." Miller v. Alabama, 567 U.S. 460, 471 (2012).

Thus, as a juvenile offender, Robinson's age at the time he committed his offenses is distinct. Some courts have deemed a defendant's young age at the time of the offense to be extraordinary, yet insufficient to grant relief—even when it is considered alongside other circumstances, such as an exceptional record of rehabilitation. See Andrews, 480 F. Supp. 3d at 687 (E.D. Pa. 2020) ("So, his age at the time of the offenses is beyond what is common, i.e., extraordinary."); see also Carter, 711 F. Supp. 3d at 440 ("By every account, Carter is a changed person than the one who was sentenced to a lifetime in prison . . ."). Whereas other courts have outright rejected such an argument because the defendant's age was "not an unanticipated circumstance" that the district court "was unable to take into account at sentencing." Jones, No. CR 07-143 (SRC), 2023 WL 2986928, at *5. Nevertheless, as more fully discussed below, Robinson's constitutionally distinct status as a juvenile, as well as this court's lack of consideration of the same at his sentencing, warrant placing greater weight on his young age than that which is typically afforded to young adults.

10

In the past two decades, the Supreme Court has issued several decisions curtailing or outright banning certain adult sentences for juvenile offenders.  See Roper v. Simmons, 543 U.S. 551 (2005) (prohibiting the death penalty for juveniles); Graham v. Florida, 560 U.S. 48 (2010) (prohibiting life-without-parole sentences for juveniles convicted of non-homicide crimes); Miller v. Alabama, 567 U.S. 460 (2012) (striking down mandatory life-without-parole sentences for all juvenile defendants).  And it has recognized that the changes in this area of constitutional jurisprudence altered the range of conduct or classes of persons subject to punishment and are to be given retroactive effect.  See Montgomery v. Louisiana, 577 U.S. 190 (2016) (holding that Miller applies retroactively).

In these cases, the Supreme Court relied upon multidisciplinary scholarship to conclude that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes."  Miller, 567 U.S. at 472.  See, e.g., Roper, 543 U.S. at 569 (noting that "scientific and sociological studies . . . tend to confirm" that "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young." (alteration in original)); Graham, 560 U.S. at 68 ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds."); Miller, 567 U.S. at 472 ("The evidence presented to us in these cases indicates that the science and social science supporting Roper's and Graham's conclusions have become even stronger.").

When discussing such "distinctive attributes," the Supreme Court has explained that "compared to adults, juveniles have a lack of maturity and an underdeveloped sense of responsibility; they are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure; and their characters are not as well formed."  Graham, 560 U.S. at 68 (cleaned up).  These characteristics mean that "their irresponsible conduct is not as

morally reprehensible as that of an adult" and they "have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." Roper, 543 U.S. at 570.

Although Roper, Graham, and Miller concerned the imposition of the "harshest sentences" on juvenile offenders, the fundamental premises underpinning these cases show an increased focus and importance on the role of youth in sentencing. The Supreme Court drew on "recent developments in neuroscience, psychology, and sociology, which demonstrate why standard penological goals apply with much less force to younger defendants in light of their immaturity, susceptibility to peer and other influences, salvageability, and dependence on family and other features of their environment that lie beyond their control." United States v. Golding, No. 05-CR-538 (JSR), 2022 WL 2985014, at *2 (S.D.N.Y. July 27, 2022).

Given Robinson's juvenile status, these principles are highly pertinent here. In light of our increased understanding of the "hallmark features of youth" and the role they play in younger offenders' crimes, these attributes can "provide a useful framework" in "the context of evaluating whether extraordinary and compelling circumstances exist." United States v. Williams, No. CR 91-559-6 (TFH), 2021 WL 5206206, at *6 (D.D.C. Nov. 9, 2021).

At the outset, not only was Robinson a minor when he committed these crimes, but he also essentially was homeless, had a turbulent relationship with his family, and had struggled with his mental health in the preceding years. The Supreme Court has made clear that compared to adult offenders, a juvenile defendant's background is "particularly relevant." Miller, 567 U.S. at 476. See, e.g., Eddings v. Oklahoma, 455 U.S. 104, 116 (1982) ("[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing."); United States v. Ramsay, 538 F. Supp. 3d 407, 422 (S.D.N.Y. 2021) ("[T]he Supreme Court has

12

explained that adolescent offenders are less culpable because they have been dependent on others for most or all of their lives.  Therefore, relative to adults' crimes, adolescents' crimes are less a product of their choices and more a product of their environment.").

Robinson grew up under extremely difficult circumstances.  ECF No. 213-2 at 18.  He never had contact with his biological father and he spent his early childhood primarily under the care of his maternal grandmother in the Homewood section of Pittsburgh.  Id.  He reported experiencing minimal rules, structure, and supervision in his grandmother's home and that violence was commonplace in the neighborhood.  Id. at 13.  When he was approximately ten years old, he moved across the city to Coraopolis with his mother.  PSIR ¶ 69.  The move was a "drastic change" for Robinson—at the time, she was a single parent with two other children and he was not accustomed to viewing her as an authority figure.  Id.  Shortly thereafter, his mother met the man who would eventually become Robinson's stepfather.  Id.  He moved into their family home not long after they met.  ECF No. 213-2 at 18.

Robinson had trouble adjusting to his new home.  PSIR ¶ 69.  When he was eleven years old, he was admitted to a psychiatric hospital for depression, suicidal ideation, and behavioral problems.  ECF No. 213-2 at 10.  Two more psychiatric hospitalizations followed over the next two years.  After Robinson's second hospitalization—arising from an incident where he attempted to overdose on cleaning fluid following an argument with his mother—his antidepressant prescription went unfilled and no one followed-up with the wrap-around mental health services that were recommended for him.  PSIR ¶¶ 73–74.  The final hospitalization occurred after Robinson's mother locked him out of their home on Christmas Day and called the police to report that he had written a letter stating that he wanted to kill his stepfather.  ECF No. 213-2 at 11–12.  According to his mother, there had been physical altercations between Robinson and his stepfather in the preceding weeks.  Id. at 12.  When Robinson was released from the

hospital six days later, his mother refused to allow him to return to her home.  Id. at 5.  He was

subsequently referred to Children, Youth, and Families ("CYF") for placement in a shelter

facility.  Id.  He was fourteen years old at the time.

A lengthy sequence of placements in shelters and group homes ensued.  A cycle was

established over the next two years: Robinson would be placed in a new program, then abscond a

few months later.  At first, his "behavior and adjustment to [the] programs would be positive,"

although "some occasional staff and peer problems" occurred.  Id. at 16.  Then, he would run

away "whenever stress and anxiety" mounted—especially "regarding issues related to home."

Id.  During this time, he returned home for roughly three months following his discharge from a

program and he was intermittently permitted home visits on the weekends.  Id. at 4–7.  At his last

group home, he began to realize that he was "being steered toward . . . entering an independent

living program" upon his completion of that program, "rather than working toward a return

home."  Id. at 7.  He realized that this was "what his mother desired" and he left the program

without permission shortly thereafter.  Id.  Approximately three weeks later, he committed the

first robbery.

An evaluation of Robinson prepared by a licensed social worker about a year after his

arrest found that his lack of maturity was evidenced in his "inability to resolve dependency

needs" and feelings of abandonment "related to his mother," and his "yearning to belong

somewhere . . . as he continued to try and establish his ultimate identity."  Id. at 16.  Moreover,

although he generally understood "right from wrong," his "needs of dependency, belonging, and

emotional and financial insecurity appear[ed] to override his intellectual/rational ability to

maintain his behaviors within legal parameters at times."  Id. at 17.

Clearly, Robinson's family instability, emotional development, and mental health history

are factors that exacerbated his "immaturity, impetuosity, and failure to appreciate risks and

consequences." <u>Miller</u>, 567 U.S. at 477.  If youth "is a time and condition of life when a person may be most susceptible to influence and to psychological damage," <u>Eddings</u>, 455 U.S. at 115, these experiences are important considerations when evaluating Robinson's "distinctive (and transitory) mental traits and environmental vulnerabilities." <u>Miller</u>, 567 U.S. at 473.

Robinson further claims that an older male, Brian Harbin, orchestrated the robberies after Harbin "took him in when he was vulnerable" and then threatened him and his family if he did not do as instructed.  ECF No. 225 at 10.  Robinson testified to the same during a hearing on a motion to withdraw his plea in 2008.  <u>See</u> ECF No. 83.  While the court does not wish to rehash the underlying facts of Robinson's offenses, it notes that the risk of "immature" and "risky" decision-making is "amplified in 'high-pressure, time-sensitive, emotional contexts' (also referred to as 'hot cognition') *or if peer pressure is being imposed*." <u>United States v. Van Putten</u>, 726 F. Supp. 3d 245, 258 (S.D.N.Y. 2024) (emphasis added) (quoting <u>Golding</u>, 2022 WL 2985014, at *3)).  Whatever else can be said, Harbin was another negative influence in Robinson's environment that supports his position that he has a "greater claim" than an adult offender "to be forgiven for failing to escape." <u>Roper</u>, 543 U.S. at 570.

Finally, while the foregoing information was available at the time of Robinson's sentencing, this court lacked the discretion to depart downward from the 32-year mandatory sentence required by the § 924(c) counts.  Although Robinson received a downward departure for the remaining counts, the sentencing guidelines at that time provided that "[a]ge (*including youth*) is not ordinarily relevant in determining whether a departure is warranted."  U.S.S.G. § 5H1.1 (2007) (emphasis added).  The guidelines further stated that a "[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted."  U.S.S.G. § 5H1.12 (2007).  Indeed, at his sentencing hearing, the government acknowledged that Robinson was "young," but advised that

"the guidelines tell us we're not supposed to consider that." ECF No. 83 at 174:24–25. Thus, Robinson's exceptionally young age and disadvantaged upbringing were not accounted for in his sentence.

Moreover, this court did not have the benefit of today's multidisciplinary studies on the fundamental differences between juvenile and adult minds. And the caselaw recognizing the impact that the "hallmark features of youth" have on a juvenile's culpability and the penological justifications for their crimes was just barely in its infancy at the time of Robinson's sentencing. Although Robinson's sentence was not rendered unconstitutional by Roper, Graham, or Miller, these cases nonetheless stand for "a simple proposition: Youth matters in sentencing." Jones v. Mississippi, 593 U.S. 98, 109 (2021). In other words, it is not the specific changes in the law brought about by this area of constitutional jurisprudence that now supply one of several factors constituting extraordinary and compelling reasons for relief. Indeed, it appears that the Supreme Court's holdings in these cases would not supply a defense to the charges against Robinson or the sentence he received if the case were to be pursued today. Instead, it is the post-sentencing seismic shift in the penological foundations for assessing the culpability and punishment of juvenile offenders emanating from these cases that provide a ground for considering whether the eligibility requirements for compassionate release are present. And because the critical social, psychological, and biological factors attributable to Robinson's *juvenile* age during all of the offense conduct were unavailable to this court and did not matter at his sentencing in any way, this court finds that his young age weighs heavily in favor of finding that a combination of factors have been presented that provide extraordinary and compelling reasons to reduce his sentence.[4]

---

[4] To be clear, had Robinson committed the offense conduct when he was not a minor, his young age would not be given as much weight or consideration in the analysis.

16

Next, the transfer of Robinson's case to adult prosecution in federal court is another circumstance that strongly supports finding him eligible for compassionate release.  The Federal Juvenile Delinquency Act ("JDA") "governs proceedings involving persons who violate federal law before reaching their eighteenth birthday."  United States v. C.S., 968 F.3d 237, 247 (3d Cir. 2020).  Federal law "generally favors referring juveniles to state authorities," but the JDA "permits federal delinquency proceedings when state courts cannot or will not accept jurisdiction or, in the case of a limited number of crimes, when there is a substantial federal interest." Congressional Research Service, C. Doyle, Juvenile Delinquents and Federal Criminal Law: The Federal Juvenile Delinquency Act and Related Matters 1 (2023).  Because federal juvenile law prefers that state authorities handle juvenile matters whenever possible, "most juvenile delinquency cases that do remain in the federal system have historically arisen in areas beyond state jurisdiction, primarily in Indian country."  Id.

Before proceeding against a juvenile in federal court, the Attorney General or his or her designee must certify that:

> (1) [T]he juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony or [is] an offense [enumerated in this paragraph], and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.

18 U.S.C. § 5032.  The decision to certify a juvenile for federal jurisdiction is left to the discretion of the federal prosecutor.  See Impounded, 117 F.3d 730, 731 (3d Cir. 1997).  Courts "have jurisdiction to review only limited aspects of the certification decision," such as "whether the certification is proper in form, whether it was made in bad faith, and the purely legal question [of] whether the juvenile has been charged with a crime of violence."  Id.

Once the certification requirement is met, the government must proceed against a juvenile in a delinquency proceeding, "unless transfer to adult criminal prosecution is authorized by statute." United States v. Y.A., 42 F. Supp. 3d 63, 75 (D.D.C. 2013). If the juvenile is not transferred to adult criminal prosecution, the district court conducts a delinquency hearing "at any time and place within the district, in chambers or otherwise." 18 U.S.C. § 5032. Upon a finding of delinquency, the court may commit the juvenile to a term of detention, but the maximum term that may be imposed upon him depends on his age and the nature of his offense. See 18 U.S.C. § 5037.

There are two mechanisms by which a transfer to adult criminal prosecution can occur under the JDA. The first is under the "so-called permissive transfer provisions," which permit a district court to "transfer a juvenile 'if such court finds, after hearing, such transfer would be in the interest of justice.'"[5] Impounded, 117 F.3d at 732 (quoting 18 U.S.C. § 5032). The second mechanism is under the "mandatory transfer provisions," which requires a transfer if three factors are met: (1) the juvenile committed the act underlying the charged offense after his sixteenth birthday; (2) the charged offense is a felony "that has as an element thereof the use, attempted use, or threatened use of physical force against the person of another, or that, by its very nature, involves a substantial risk that physical force against the person of another may be used in committing the offense" or is an offense enumerated therein; and (3) the juvenile has previously been found guilty of a crime that would satisfy the second factor. 18 U.S.C. § 5032.

---

[5] Pursuant to § 5032, in assessing whether a transfer would be in the interests of justice, the following six factors shall be considered: "[T]he age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems." 18 U.S.C. § 5032.

In Robinson's case, the government filed a juvenile information against him, a certification for federal jurisdiction, and moved to transfer the proceedings to adult prosecution under both the mandatory and permissive provisions of § 5032.  The government argued that the three factors necessary for a mandatory transfer were satisfied: Robinson committed the underlying acts after his sixteenth birthday, the offenses with which he was charged satisfied the "physical force" requirement of the second factor, and he had previously been adjudicated delinquent for simple assault.  See United States v. L.R., No. 2:05-cr-341, Sealed Docket No. 21 (W.D. Pa., Jan. 18, 2006).  The government's position regarding a permissive transfer was less clear—in its brief in support, the government suggested that Robinson might "waive the transfer issue" after reviewing its arguments therein and "seeing that a mandatory transfer of all counts cannot be avoided."  Id. at 7.  And it further reported that the parties had already discussed this possibility and that their discussions would resume.  Id.

In lieu of a brief in opposition, Robinson filed a motion to dismiss the information, challenging the sufficiency of the government's certification of federal jurisdiction.  See Sealed Docket No. 22.  However, he did not otherwise contest the government's motions to transfer.  See Sealed Docket No. 33 at 2.  A few months later, this court granted the motion for a permissive transfer from the bench during a hearing on the same.  See Sealed Docket No. 32.  Shortly thereafter, the court issued a memorandum order granting the government's motion for a mandatory transfer in the alternative.  See Sealed Docket No. 33.

Robinson's mandatory transfer was predicated in part upon his prior juvenile delinquency adjudication for simple assault, which arose from an incident that occurred in 2000 when he was just twelve years old.  He had assaulted a fellow student during school recess, inflicting injuries that necessitated emergency room treatment.  PSIR ¶ 61.  Following his adjudication of delinquency, he was placed on probation and referred to Spectrum Services for anger

19

management and family counseling.  Id.  After participating in counseling as directed and making a "positive adjustment," his probation was closed approximately eight months later.  Id.

Robinson argues that his delinquency adjudication for simple assault under 18 Pa. C.S. § 2701 did not satisfy the "physical force" requirement of the mandatory transfer provisions.  He therefore contends that he had not "previously been found guilty of an act" that satisfied the second factor of § 5032, so his mandatory transfer was "predicated on legal error."  ECF No. 213 at 38.  While the government agrees that "[m]ischaracterizing the nature of a state crime as qualifying predicate offense is a legal error," it argues that such defects "cannot constitute an extraordinary and compelling basis for compassionate release."  ECF No. 222 at 21.  The court agrees—a motion for compassionate release is not the proper avenue to raise such a challenge. See, e.g., United States v. Thornton, No. 21-3322, 2022 WL 3134221, at *2 (3d Cir. Aug. 5, 2022) ("To the extent Thornton argues that he is entitled to compassionate release because of alleged trial and sentencing errors, he essentially presents another challenge to the validity of his conviction and sentence, and such challenges are typically brought under 28 U.S.C. § 2255 instead."); Okereke v. United States, 307 F.3d 117, 120 (3d Cir. 2002) ("Motions pursuant to 28 U.S.C. § 2255 are the presumptive means by which federal prisoners can challenge their convictions or sentences . . . .").

However, Robinson further argues that the court "can presume [the] transfer proceedings were free from any error" and still "conclude that the transfer of a juvenile offender to federal district court" is an extraordinary and compelling reason warranting compassionate release.  ECF No. 225 at 13.  This position is much stronger.  Simply put, federal intervention in juvenile proceedings is highly uncommon.  Indeed, in over twenty-two years of experience on the bench, this is the only instance where this member of the court has dealt with the federal juvenile system and the issues arising thereunder.  Thus, Robinson's contact with the federal courts as a juvenile

was a circumstance that was "beyond what is usual, customary, or common." <u>Carter</u>, 711 F. Supp. 3d at 441.

Moreover, official data from the Department of Justice ("DOJ") confirms the irregularity of Robinson's experience.  The DOJ's primary statistical agency, the Bureau of Justice Statistics ("BJS"), reports that between 1998 and 2022, only 0.2% of the individuals charged in federal court were juveniles. <u>See</u> Federal Criminal Case Processing Statistics, Bureau of Justice Statistics, <u>https://fccps.bjs.ojp.gov/</u>.[6]  Likewise, out of the approximately 91,000 people charged in federal court in 2005, only 167 individuals had their charges initiated by a juvenile proceeding—Robinson, of course, being one of them. <u>Id.</u>  As these figures indicate, the adoption of Robinson's charges to federal district court was a scenario that fell "outside the experience of nearly all federal inmates." <u>Carter</u>, 711 F. Supp. 3d at 441.

That said, even after Robinson was under federal jurisdiction, the JDA ostensibly conferred a presumption of juvenile treatment upon him. <u>See</u> <u>United States v. A.R.</u>, 38 F.3d 699, 706 (3d Cir. 1994).  At the same time, this statute "impart[s] considerable prosecutorial discretion as to whether an accused will be tried as an adult even though the criminal conduct charged qualifies as an act of juvenile delinquency." <u>United States v. Welch</u>, 15 F.3d 1202, 1207 (1st Cir. 1993).  Especially under the mandatory transfer provisions, which permit "the government to implement—again, on mere allegation, without prior hearing or judicial authorization . . . the 'transfer' of a recidivist juvenile offender for trial as an adult." <u>Id.</u> Therefore, once the government decided to proceed against Robinson under the mandatory transfer provisions and subsequently established that each of the three factors were present in his case, this court was required to order his transfer to adult prosecution.

---

[6] To generate this figure with the BJS's Data Tool, select "Persons charged" under "Prosecution/Courts," then select "Type of initial proceeding" from the "Select a variable" dropdown menu.

Had Robinson remained in juvenile delinquency proceedings, the maximum term of detention that this court could have imposed was five years.  See 18 U.S.C. § 5037(c)(2)(A).  But once he was transferred to adult prosecution, the four § 924(c) counts exposed him to a potential 82-year statutorily mandated minimum penalty.  That is to say, Robinson's transfer to adult criminal prosecution was "truly grave" in that it resulted "in serious consequence."  Carter, 711 F. Supp. 3d at 441.

Although this court also granted the government's motion for a permissive transfer, the Supreme Court has explained that "the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court."  Miller, 567 U.S. at 489.  A judge's "transfer-stage discretion" has "limited utility" because "the decisionmaker typically will have only partial information at this early, pretrial stage" and "often does not know then what she will learn, about the offender or the offense, over the course of the proceedings."  Id. at 488. This was certainly true in Robinson's case.  At that juncture, the court had only been informed that Robinson had confirmed his involvement in the offense conduct in a custodial statement. See Sealed Docket No. 21 at 2.  Beyond this summary description, the court was not made aware of the actual nature and circumstances surrounding Robinson's confession.  And these circumstances, which were known to the government, virtually assured that it would be able to obtain a conviction on all four § 924(c) offenses or otherwise insist on defendant pleading in a manner that would produce a harsh sentencing outcome.

Moreover, as evidenced in Robinson's case, "transfer decisions often present a choice between extremes: light punishment as a child or standard sentencing as an adult."  Id.  Such a dilemma arose here: Robinson could either receive a 5-year term of detention in juvenile court or be subject to an 82-year statutorily mandated minimum penalty as an adult if convicted on all § 924(c) counts.  So, while this court found that a juvenile proceeding was not appropriate, its

decision to grant a permissive transfer does not mean it concluded that such a severe adult sentence was warranted or even needed to satisfy the goals of sentencing.

While there does not appear to be any statistics on the prevalence of transferring a juvenile to adult status in the federal system, there is some illuminating data regarding the 32-year sentence imposed upon Robinson. To begin, out of the approximately 7,800 people sentenced in federal court for weapon offenses in 2008, Robinson was among only 134 individuals who received a prison sentence of 360 months or more. See Federal Criminal Case Processing Statistics, *supra*. Crucially, only *twenty-five* of those 134 individuals were younger than twenty-five at the time of their commitment. Id. Moreover, the BJS's Data Tool shows that the average sentence for a person "convicted under 18 U.S.C. § 5032" in 2006 was 28.3 months. Id. Presumptively, this average is based upon the individuals who remained in juvenile proceedings and were subsequently adjudicated delinquent, but it is unclear how this calculation accounts for the people who were subject to the transfer provisions of § 5032, if at all. Regardless, the disparity between this average and Robinson's sentence of 384 months further reflects the profound impact of his transfer to adult prosecution.

The foregoing statistics suggest that the circumstances surrounding Robinson's transfer were similar in gravity to the scenarios enumerated in paragraphs (1) through (4) of U.S.S.G. § 1B1.13(b). Not only was it rare to bring charges against a juvenile in federal court, but the transfer ultimately ended in a mandatory sentence that was an extreme outlier among Robinson's age group. And, as Robinson points out, his mandatory transfer was predicated on conduct that he committed when he was just *twelve* years old. To put it another way, Robinson's treatment as an adult was premised in part upon the acts he committed as a young child during school recess. To be sure, his actions then were severe and violent, but the fact remains that he is still enduring the consequences of his wrongdoings twenty-five years later as a 36-year-old man. Therefore,

the transfer carried truly grave consequences that likely produced real harm and damage. Accordingly, the transfer of Robinson's case to adult prosecution in federal court is yet another factor that supports finding extraordinary and compelling reasons to reduce his sentence.

Turning to the final two grounds that Robinson presents: the impact of adult incarceration on juvenile and youthful offenders and his efforts toward rehabilitation notwithstanding these circumstances. While Robinson offers these bases separately, the court does not believe that each argument amounts to a factor supporting relief when considered alone. However, when considered together, his incarceration in adult facilities as a juvenile and the strides he has made toward rehabilitation thereafter is another circumstance that weighs in favor of finding extraordinary and compelling reasons to reduce his sentence.

Robinson spent nearly two years of his pretrial detention in "protective" custody at the Allegheny County Jail because he was a juvenile in an adult facility. See ECF No. 31. As a result of this custody status, Robinson was isolated from the general adult population and spent 23-hours a day locked in his cell. Id. ¶ 9.

Since that time, the Third Circuit has acknowledged "the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement." Palakovic v. Wetzel, 854 F.3d 209, 225 (3d Cir. 2017). It has observed "a growing [scientific] consensus" that such conditions "can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity." Id. The Third Circuit also has noted that an examination of a representative sample of sensory deprivation studies had found that "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." Williams v. Sec'y Pennsylvania Dep't of Corr., 848 F.3d 549, 566 (3d

Cir. 2017) (quoting Craig Haney & Mona Lynch, Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement, 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997)).

In the context of juvenile offenders in solitary confinement, it has been established that they are "at particular risk of such adverse reactions" due to "their developmental vulnerability." American Academy of Child & Adolescent Psychiatry, Solitary Confinement of Juvenile Offenders (April 2012), available at: https://www.aacap.org/aacap/Policy_Statements/archive_policy_statements.aspx.  In this regard, "[a] growing chorus of courts have recognized the unique harms that are inflicted on juveniles when they are placed in solitary confinement." J.H. v. Williamson Cnty., Tennessee, 951 F.3d 709, 718 (6th Cir. 2020) (collecting cases).  Hence, the duration of Robinson's solitary confinement and his unique vulnerabilities—namely, his documented mental health issues and juvenile status/young age—rendered him particularly susceptible to the negative effects of solitary confinement.

There is also an expanding body of research on the potential harms of incarcerating young people in adult facilities.  One study examined longitudinal data over twenty years and found that "youth incarceration in an adult facility may have lasting deleterious ramifications for the mental well-being of young people for years to come."  Daniel C. Semenza, Ian A. Silver, & Dylan B. Jackson, Youth Incarceration in Adult Facilities and Mental Health in Early Adulthood, 74 J. Adolescent Health 989, 993 (2024).  Further, "those who spent more time in an adult facility experienced poorer mental health over the study period," which suggested "a dosage effect."  Id.

Robinson has spent his entire adult life incarcerated.  He has been detained since his arrest twenty years ago at age seventeen.  Despite spending his formative years in custody, he

has made significant strides in bettering himself through education and career development.  He obtained his GED while in pretrial detention at the Allegheny County Jail.  PSIR ¶ 76.  His security classification was downgraded by 2012, and, based on his most recent program review, he is projected to enter a low-security facility this month.  See Oct. 28, 2024, Hr'g Tr. at 16:6–8.  Moreover, he has completed over 320 educational hours, including courses in writing, taxes, and career development.  See ECF Nos. 213 at 45–46; 213-4 at 8.  He has repaired his relationship with his mother and she now "stand[s] ready to welcome him home."  ECF No. 213 at 46.  This is especially meaningful not only in light of their volatile history, but also because she has never been able to visit him in prison as he has consistently been confined in facilities that are a considerable distance away.  See Oct. 28, 2024, Hr'g Tr. at 15:1–3.

To be sure, Robinson's disciplinary record has not been free of infractions.  The most serious incidents occurred between 2009 and 2012 when he assaulted another inmate, struck a prison guard with a closed fist while restrained, and possessed a dangerous weapon.  See ECF No. 213-4.  These infractions occurred within the penitentiary when Robinson was, in his words, "a young man, in a violent environment, still in the process of maturing."  ECF No. 132-2 at 5.  More recently, in 2017 Robinson engaged in fighting with another inmate and was given fifteen days of segregation and lost twenty-seven days of good time credit.  ECF No. 213-4 at 2.  And in March of 2023, Robinson was written up for fighting with another person and was given thirty days of segregation, and lost commissary privileges for six months and twenty-seven days of good time credit.  Id. at 1.  While in segregation for this infraction, Robinson defiled his cell by smearing feces on the wall after he was not permitted to leave his restricted dry cell to use the toilet after repeated requests to do so.  Id.; see ECF No. 225 at 34.

The government points to Robinson's disciplinary record and argues that his "conduct since his incarceration belies and undermines any purported rehabilitation."  ECF No. 222 at 25.

26

But its attempt to view Robinson's progression toward maturity and responsibility through such a myopic lens is unavailing. It is naïve to believe that young inmates spending years in a penitentiary will emerge without disciplinary infractions. And while the court does not discount Robinson's multiple infractions, which include the fairly recent 2023 incident, it is unconvinced that his record reflects a level of severity that nullifies his many efforts to improve himself. And the sanctions imposed for these more recent incidents and Robinson's progression toward a downgrade in his security rating suggest that the BOP agrees with this assessment.

Robinson spent two years in isolated custody as a juvenile and became a young man in prison. With the benefit of multidisciplinary research and studies, the potential negative mental health consequences of these experiences are now more concrete. The government counters that Robinson cannot claim this point as an extraordinary and compelling reason because he "provides no proof that he is suffering from any of the afflictions or conditions identified in the studies he cites." ECF No. 222 at 24. But the extraordinary thing here is that he has managed to mature and find introspection despite these circumstances. Indeed, when Robinson was sentenced as a young man, he stated, "I understand what's going on. I understand that's what the penalty is here. But it's hard to grasp because . . . What [do] I have to look forward to?" ECF No. 83 166:20–23. By 2019, he wrote to the court that his time in prison had "allowed [him] to grow and mature in ways [he had] never imagined" and that he was "grateful for his journey and the many life lessons that [he had] learned along the way." ECF No. 132-2 at 4. From despair to gratitude—from child to man—the court finds that his incarceration in adult facilities as a juvenile and the strides he has made toward rehabilitation notwithstanding the inhibiting aspects of that experience is yet another consideration that supports finding extraordinary and compelling reasons to reduce his sentence.

In combination and when considered longitudinally, Robinson's juvenile status during all aspects of his relevant criminal conduct, the profound impact of the transfer of his case to federal district court for prosecution as an adult, his initial solitary confinement as a juvenile in an adult facility being directly followed by spending his early adulthood in prison and the rehabilitative progress he has made notwithstanding, establish extraordinary and compelling reasons to reduce his sentence. Thus, he has met the "threshold eligibility hurdle" for release under § 3582(c)(1)(A)(i).[7] Stewart, 86 F.4th at 535.

Having found that extraordinary and compelling reasons exist, the court must next weigh the factors set forth in 18 U.S.C. § 3553(a) to determine whether a sentence reduction is warranted, and, if so, the extent of that reduction. As relevant here, these factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner; and (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a).

Because the court addressed Robinson's history and characteristics at length *supra*, we begin with the nature and circumstances of his offenses. As referenced above, Robinson pled guilty to armed bank robbery and brandishing a firearm during a crime of violence. Although he did not discharge a gun or physically injure anyone in the course of the robberies, these were nonetheless serious and violent crimes. This court recognized as much at sentencing and noted

---

[7] Because Robinson has demonstrated his eligibility for relief under the catchall provision in (b)(5), the court need not decide whether he is entitled to relief under the "unusually long sentence" provision in paragraph (b)(6).

that the bank robberies "would have been extremely distressing for the victims."  ECF No. 83 at

179.  But even as this court acknowledged the severity of Robinson's crimes, it also noted that

"thirty-two years is a long period of time" and his sentence "should include at least a hope that

[he] will be able to salvage some portion of his life."  Id.

As discussed, prior to committing the crimes for which he is incarcerated, Robinson was

adjudicated delinquent for simple assault when he was twelve years old.  The government noted

at sentencing that he was "getting into trouble" at a very young age, and his juvenile record and

inability to adjust indicated there was "a spiral that was escalating."  Id. at 175–76.  While

Robinson's spree of bank robberies demonstrated a concerningly steep increase in the severity of

his criminal behavior, his simple assault adjudication is not properly viewed as the start of this

more serious conduct.

First, the robberies took place over the span of three weeks and occurred about five years

after his delinquency adjudication for the simple assault.  Further, the bank robberies

demonstrated a significantly higher level of criminal sophistication—he purchased suits

beforehand to "look less suspicious entering the banks," he wore a wig and baseball cap during

the robberies, and he obtained getaway cars and guns from "various sources."  PSIR ¶¶ 6–10.

Some of the getaway cars that Robinson used had been reported stolen, and he admitted that for

one robbery, he used a vehicle "taken from an area . . . where stolen cars [were] left for others to

use."  Id. ¶ 7.

Given Robinson's lack of criminal sophistication in his prior criminal conduct, these facts

suggest that he was receiving resources and guidance from other individuals or, at the very least,

was influenced by other actors.  While such associations are in themselves concerning, they

should not be assessed separately from Robinson's juvenile status.  And when viewed in context,

the factual and temporal differences between these crimes and Robinson's simple assault

adjudication indicate that his simple assault was not closely linked to the commission of his offense conduct.  Moreover, the robberies took place after he was precluded from returning to his family home and struggling with the belief that he had to find a way to live on his own.  When Robinson's offenses are considered in this context, the government's characterization of his criminal history is overstated.

Clearly, there was a strong need to protect the public and adequately deter future criminal conduct when imposing Robinson's sentence.  That said, even considering the substantial departure Robinson received for his armed bank robbery convictions, his sentence was severe.  As the court previously stated, "there is nothing 'ordinary' about imposing a 32 year statutorily mandated minimum sentence on an individual for committing [four] armed robbery offenses within weeks of each other and while that individual was a minor."  ECF No. 195 at 13.  That is particularly so because Robinson had not been previously incarcerated, so his criminal history lacked any indication that a shorter sentence would fail to achieve the requisite objectives of incarceration.  See United States v. Mishoe, 241 F.3d 214, 220 (2d Cir. 2001) ("Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve.").

To be sure, Robinson's young age placed him at a higher risk of recidivism and the efficacy of his prior non-carceral punishments proved to be inadequate.  Both of these facts indicated that a lengthy term of imprisonment was appropriate.  Yet, the gap between having never spent time in prison and a 32-year sentence is more than immense.  Of course, the statutorily mandated sentence imposed upon him "did not result from any individualized consideration of his background and characteristics."  United States v. Somerville, 463 F. Supp. 3d 585, 602 (W.D. Pa. 2020).  In other words, "if not for the mandatory-minimum roadblock,"

Robinson's individualized circumstances, including his limited criminal history and lack of previous incarceration, would have warranted a lesser sentence.  Id.

Next, the need to avoid unwarranted sentence disparities weighs in favor of compassionate release.  In 2018, Congress amended § 924(c) such that the 25-year consecutive mandatory minimum for a subsequent § 924(c) offense occurs only "*after* a prior conviction under this subsection has become final."  18 U.S.C. § 924(c)(1)(C) (emphasis added).  So, if Robinson had been sentenced today, his second § 924(c) conviction would not have triggered a 25-year mandatory minimum.  Instead, his two § 924(c) convictions would have only resulted in mandatory minimums of 7-year consecutive terms of imprisonment, for a combined term of fourteen years.  Of course, his sentences for the bank robbery offenses would have to be reconsidered as well.  But given the 18-year difference in the applicable mandatory minimum, Robinson's combined sentence would in all likelihood be far below thirty-two years.  In other words, it can be said that Robinson's original sentence is "grossly disproportionate to one that would be handed down today."  Carter, 711 F. Supp. 3d at 443.  Accordingly, the § 3553(a) factors weigh in favor of reducing Robinson's sentence.

Sufficient punishment for the severity of Robinson's crimes is adequately accounted for in the twenty years he has already served in prison.  Much of this time has been served under the harsh conditions in a federal penitentiary.  Under these circumstances, twenty years "is a long time—long enough to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes."  United States v. Rodriguez, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020).  And although Congress did not make the change to the mandatory minimums of § 924(c) retroactive, this amendment further supports the sufficiency of the time that Robinson has

already served in prison.  See United States v. Adeyemi, 470 F. Supp. 3d 489, 531 (E.D. Pa. 2020).

Moreover, even assuming that the original judicial fact finding as to sentencing factors continues to apply, a proposition clearly disputed by Robinson, a sentence of time served essentially reflects more than what a guidelines sentence would be today.  Robinson's plea to counts 3 and 6 (the two separate § 924(c) counts) would net a guidelines sentencing range of 168 months (fourteen years).  His bank robbery counts would be calculated as follows: counts 2 and 5 would each produce an offense level of 22 (a base offense level of 20 and a 2-level increase because property was taken from a financial institution); and counts 8 and 11 would each produce an offense level of 27 (a base offense level of 20, a 2-level increase because property was taken from a financial institution, and a 5-level increase because he brandished a firearm in the commission of the offense).  See U.S.S.G. § 2B3.1; see also U.S.S.G. § 2K2.4, comment. (n.4).  The grouping of these four counts would result in a 3-level increase (one unit for count 8 as the group with the highest offense level, a 1-level increase for count 11 because it has the same level of seriousness as count 8, and a 1-level increase for counts 2 and 5 because each of these counts is 5 levels less serious than count 8).  See U.S.S.G. § 3D1.4.  This produces a combined offense level of 30, which is decreased by three levels for acceptance of responsibility to produce an adjusted base offense level of 27.  A base offense level of 27 when combined with a criminal history category of II produces a guidelines sentencing range of 78 to 97 months for the bank robbery counts.  When combined with the 168 months for counts 3 and 6, the guidelines sentencing range Robinson would face today is 246 to 265 months.  Given that the BOP has credited Robinson with serving approximately 245 months as of this date and he has earned over 40 months of good time credit, a 285-month sentence is almost two years above today's guideline sentencing range.  See ECF No. 213-3.

Finally, Robinson has demonstrated remorse for his crimes and stated his desire to become a productive member of society.  See ECF No. 132-2 at 4.  Despite struggling at sentencing to identify the things he had "to look forward to" upon his release, he has continued to better himself through education and sought to maintain ties with his family and community under challenging circumstances.  His mother and sister have indicated they will welcome him home upon release, which is "an important and relevant consideration when evaluating his circumstances."  Carter, 711 F. Supp. 3d at 440.  "This stable support system and home to return to suggest there is a reduced likelihood that [Robinson] will regress into criminal or dangerous behavior."  United States v. Nunez, 483 F. Supp. 3d 280, 287 (E.D. Pa. 2020).  And as outlined above, the overall improvement in Robinson's disciplinary record and the reduction in his security rating support the proposition that, from a long-term perspective, his behavior has undergone a very positive transformation.  And it can be assumed from the foregoing that Robinson is no longer a danger to the community, as provided in 18 U.S.C. § 3142(g).  See U.S.S.G. § 1B1.13.  It follows that a time served sentence is sufficient but not greater than necessary to serve the enumerated purposes of punishment.

Accordingly, Robinson's sentence will be reduced to time served plus a reasonable period of time (not to exceed 30 days) for processing his release, followed by five (5) years of supervised release with the standard and special conditions that the court commonly imposes for the offenses of conviction.  The Probation Office will be able to petition the court for any additional changes that are needed, including adjustments in the event defendant does not have a satisfactory home plan upon his release.

Based on the foregoing, defendant's motion for compassionate release will be granted.

An appropriate order will follow.

Date: March 18, 2025

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:    Renee Pietropaolo, AFPD
       Michael Ivory, AUSA

       *(Via CM/ECF Electronic Mail)*